1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   OSCAR PABLO TORRES,                      No.  1:17-cv-00169-LJO-SKO

12                    Petitioner,

13          v.                                **FINDINGS AND RECOMMENDATION
                                              THAT THE COURT DENY PETITION
14   SUZANNE PEERY,                           FOR WRIT OF HABEAS CORPUS**

15                    Respondent.
                                              **(Doc. 1)**
16

17

18          Petitioner, Oscar Pablo Torres, is a state prisoner proceeding pro se with a petition for writ

19   of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner presents six grounds[1] for habeas relief:

20   (1) insufficient evidence; (2) his conviction for aiding and abetting an assault is unconstitutional;

21   (3) the jury relied on an improper theory in finding Petitioner guilty of attempted murder; (4)

22   prosecutorial misconduct; (5) ineffective assistance of counsel; and (6) cumulative error.  The Court

23   referred the matter to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302

24

25   _____

26   [1] In his petition, Petitioner alleged fifteen grounds for habeas relief.  Based on the claims, the Court has combined
     similar grounds.  Petitioner alleged seven insufficient evidence claims, which were labeled as claims 1, 2, 4, 7, 8, 10,
27   and 13 in the petition.  Petitioner labeled his aiding and abetting claim as claim 3 in his petition.  Petitioner alleged two
     improper theory claims, labeled as claims 5 and 6 in the petition.  Petitioner labeled his prosecutorial misconduct claim
     as claim 9 in the petition.  Petitioner alleged three ineffective assistance of counsel claims, claims 11, 12, and 14 in the
28   petition.  Petitioner labeled his cumulative error claim as claim 15 in the petition.

1

and 304. Having reviewed the record and applicable law, the undersigned recommends that the Court deny habeas relief.

## I.        Procedural and Factual Background[2]

On December 4, 2011, Kings County Sheriff's Deputy Matthew Washburn ("Washburn") responded to reports of a stabbing at the Tachi Palace gaming casino in Lemoore, California. Washburn arrived at 5:10 a.m., and found the victim, Jaime Ocegueda ("Ocegueda" or "the victim") being attended to by emergency personnel outside the main entrance of the casino. Ocegueda was suspected of being a member of the Sureño gang. He was airlifted to a hospital with life-threatening injuries. Ocegueda had a bump on his head and three stab wounds, including a puncture wound to his chest above his right nipple, a cut to his chest below the right armpit along his ribcage, and a cut to his left shoulder.

The Tachi Palace has several hundred security cameras throughout the casino, which time and date stamp the recordings. Video was provided to law enforcement for the date and time in question and was ultimately admitted into evidence during the trial. The surveillance video captured Petitioner along with several other men involved in the incident entering the casino, walking through the casino, and entering an elevator. It also captured portions of the assault.

Petitioner can be seen entering the casino at 3:51 a.m. Less than a minute later, Angel Rodriguez ("Rodriguez"), Eduardo Mata ("Mata"), and Javier Talavera ("Talavera") are seen entering the casino. Video from inside the casino depicted Petitioner wearing black pants, a red shirt, and a plaid Pendleton. Petitioner was the only person of the nine people arrested that evening wearing a plaid top and black pants.

[2] The factual background, taken from the opinion of the California Court of Appeal, Fifth Appellate District, *People v. Torres*, F067249 (Cal. Ct. App. Mar. 12, 2015), is presumed to be correct. 28 U.S.C. § 2254(e)(1).

The video shows Petitioner standing with five individuals in the casino, including Johnny DeLeon ("DeLeon"). Subsequently, Petitioner enters an elevator with several individuals, while two men hold the doors open. Shortly thereafter, the victim and his girlfriend can be seen walking by the elevator and toward the main entrance of the casino. Within seconds, the group inside the elevator, including Petitioner, exit and walk towards the main entrance of the casino. Sandra Lopez ("Lopez") and Mata can be seen looking in the direction of the main entrance and appear to be watching something. The next video shows the main foyer and the victim and his girlfriend leaving, followed by Petitioner and several other persons.

Part of the altercation was captured on video. Deputy Christopher Fernandes ("Fernandes") testified that the video showed the victim being attacked by a group of four or five men. The video depicted the main foyer, which led outside through automatic sliding doors. Although the assault took place outside, portions could be seen through the open doors. Initially, there appeared to be an altercation and then the victim is seen standing on the steps to the main entrance. The victim is next knocked to the ground between the sliding doors. His girlfriend falls on top of him, then a member of Petitioner's group, DeLeon, can be seen standing over the victim and punching him.

An outside camera pointed at the stairs leading to the main entrance also captured the assault; however, due to the lighting, it is difficult to identify the individuals involved. From a different tape, Fernandes testified he could identify Petitioner and two others on the video. Fernandes testified that Petitioner can be seen participating in the assault and can be seen getting knocked down at one point during the altercation. Video from a camera depicting the stairs to the main entry showed Petitioner and the others leaving the area.

Noemi Molina ("Molina"), the mother of the victim's child, was with him on the day of the stabbing. At trial, Molina admitted the victim was stabbed that night, but claimed not to remember anything about the stabbing and denied having any knowledge about gangs.

A deputy spoke to Molina on the night of the stabbing and testified regarding statements she made to him that evening. Molina stated she and the victim had been at the casino for approximately 10 minutes when she wanted to step outside because the cigarette smoke was bothering her. As they were walking outside, some Hispanic men began making gang references, saying "north side" toward the victim. The men then attacked the victim, eventually knocking him to the ground. Once on the ground, the attack continued. Molina attempted to pull some of the attackers away from the victim, but was unable to do so. She did not see any weapons that were used during the attack. At one point, one of the attackers said they needed to flee before the police arrived and they left. When Molina checked the victim, she discovered he had been stabbed. Molina viewed several of the detained suspects at the casino to determine if they were involved in the attack, and identified several men as being involved.

Lopez, who was present with Petitioner's group at the time of the attack, testified at trial pursuant to an agreement with the district attorney's office. She was initially charged with attempted murder and a gang enhancement but was allowed to plead to accessory after the fact in exchange for her truthful testimony. Lopez went to the casino that evening with a man and eventually met up with the group who participated in the fight. Some of the men in the group were asking other people if they "banged" and where they were from. One of the men was flashing a gang tattoo that said "Fres Norte."

At one point during the evening, Lopez was in the elevator with approximately five of the men while two others held the elevator doors open. The group got out of the evaluator and the men began arguing with the victim. Lopez remembered at least five men punching the victim, but could not specifically remember who was involved in the fight. She did, however, recall Petitioner punching the victim while he was standing, but not more than twice. She did not see Petitioner stab anyone, but looked away during the fight. The fight lasted approximately two minutes.

4

After the fight, Lopez left with Petitioner, Mata, and Talavera. As they were walking, Lopez heard the men discussing how they had beaten up the victim. Shortly before the group was stopped by the police, Petitioner gave Lopez a knife, which she put in her boot. Deputies later recovered the knife when they observed Lopez remove the knife from her boot and put it in her pants while she was in the interview room. Lopez told the police Petitioner had given her the knife, but only described him by his clothing, not by name, as she did not know his name that evening.

When opened, the knife measured a total of eight inches and had a three-inch blade. Subsequent testing of the knife revealed the presence of the victim's blood on the blade.

While on the way to the scene of the stabbing, Deputy Fernandes saw four individuals, later identified as Mata, Talavera, Lopez, and Petitioner, walking a few miles from the casino. As the individuals appeared to match the descriptions he had received about the persons of interest in the stabbing, Fernandes stopped the group and detained them. When ordered to stop, Fernandes saw Mata discard a nonworking cell phone and Talavera throw a Houston Astros baseball cap. Five additional men were detained at the casino, including Angel Rodriguez ("Rodriguez").

Petitioner was arrested approximately two and a half to three miles from the casino and interviewed by Fernandes. Petitioner initially stated he did not have anything to do with the assault, but later admitted his involvement. Petitioner stated he was pushed into the fight, the victim's girlfriend grabbed him and he shook her off, and that he kicked the victim one time when he was on the ground. When asked if he was expected to do something when his "homeboys" got into a fight, Petitioner replied he had to get involved.

Petitioner claimed he did not discuss the assault with others afterwards, even though they walked together for a few miles. Petitioner denied touching a knife or giving a knife to Lopez. He admitted to being in the Norteño gang for four years. When asked about his "DC" tattoo, Petitioner

initially said it stood for the Dallas Cowboys, but later affirmed it also meant Devil's Colony.[3]

At trial, Officer Chris Martinez ("Martinez") of the Avenal Police Department testified as a gang expert about his familiarity with the Nuestra Familia, a prison gang. The Norteños fall under the Nuestra Familia and occupy the part of California north of Bakersfield. Their primary rival is the Sureño gang.

The Norteño gang associates with the numbers 1 and 4, the letter N, and the color red. Additionally, the gang uses various symbols to represent the number 14, which is significant to the gang because it represents the letter N, the 14th letter of the alphabet. The Varrio Colonia Parlier Norte ("VCPN") and the Devil's Colony ("DC") are both part of the Norteño structure and are considered subsets of the Norteño gang. Members of the two gangs generally associate with each other. Subsets are usually identified with a geographical area.

The DC subset originated in 2008 with Petitioner and two others as the founding members. The VCPN and DC share common primary activities, such as fighting, possessing and concealing weapons, transporting drugs for possession and sale, and assaulting other gang members with weapons. The two gangs share common rivals, the Sureños and the Bull Dogs. Both the VCPN and DC are violent gangs, whose primary violent activity is stabbings. In most of the stabbing situations, five to ten Norteños confront a lone rival gang member.

Evidence at trial established Petitioner had several tattoos, including "North Side" on his chest, the numerals 1 and 4 on his shoulders, 559 on his right arm, DC on his left arm, and "these secrets" on his right hand. On the night of the stabbing, Petitioner was wearing a red T-shirt and a belt with a red star.

---

[3] Devil's Colony is a part of the Norteño gang structure and considered a subset of the Norteños gang.

Officer Martinez reviewed law enforcement contacts, tattoos, photographs, admissions, and other evidence of the men who were detained after the assault. Martinez also reviewed Petitioner's law enforcement contacts, including (1) an incident where he was stabbed by a rival gang member, (2) his association with other gang members, (3) observations of him wearing gang attire, (4) his admission of gang membership, (5) a photograph of Petitioner along with other gang members where Petitioner is making a gang sign with his hands, and (6) his tattoos. He opined each man was a member of either the VCPN or DC.

Deputy Kevin Smyres ("Smyres") also testified as a gang expert. He opined the stabbing occurred for the benefit of the Norteño gang to gain respect from a rival gang as well as the general public. Norteño gang members increase their respect level through participating in violent acts, so the stabbing increased the respect for the Norteños as a whole as well as for the VCPN and DC.

Deputy Smyres believed the stabbing was done in association with the Norteño criminal street gang because all assailants were Norteño gang members, based on their clothing, tattoos, actions, and group association. By displaying their tattoos and wearing red clothing during the attack, the group was demonstrating their gang purpose. Further, Smyres opined the victim was a member of the Sureño street gang, based on the fact the victim had a tattoo of three dots on the web of his hand, advertising his gang membership.

At trial, Petitioner admitted he went to the Tachi Palace casino with Talavera, Mata, and two other persons. He further admitted he was a member of the DC, but claimed the others were not members of the gang. Petitioner denied knowing Lopez, claiming the first time he saw her was the night of the incident and did not speak to her that evening.

On the evening of the stabbing, Petitioner was in the elevator and saw Lopez and Mata enter the elevator. When Petitioner's friends exited the elevator, he followed them, thinking they had decided to leave the casino. As he walked outside, Petitioner saw the victim fighting with DeLeon.

7

Talavera got involved in the fight. Petitioner claimed he did not know why the fight broke out. After Petitioner walked outside, the victim hit him in the face, and in response, Petitioner kicked him once. The victim was standing when Petitioner kicked him. The victim's girlfriend grabbed Petitioner and told him to leave the victim alone.

The only involvement Petitioner claimed to have had in the fight was kicking the victim in the leg. Petitioner denied knowledge that the victim was stabbed and denied providing anyone with a knife. Petitioner specifically testified that he did not give a knife to Lopez.

After kicking the victim, Petitioner ran to the parking lot to find his friend's car in order to leave the casino. He testified that he ran because he did not want to be held responsible for the fight. Petitioner could not find his friend, so he followed Talavera, Mata, and Lopez as they walked away from the area. Petitioner did not talk to the group because he was angry about what happened.

Petitioner claimed that although he is a gang member, he is not required to help fellow gang members who are involved in a fight, and his failure to help would not be viewed as cowardice within the gang. Petitioner admitted he is a member of the DC gang, and therefore part of the Norteño gang. On cross-examination, Petitioner admitted that the people he was with at the casino were Norteño gang members.

Petitioner was convict by a jury of attempted premeditated murder (Cal. Penal Code §§ 664, 187(a)), assault with a deadly weapon (Cal. Penal Code § 245(a)(1)), assault by means of force likely to produce great bodily injury (former Cal. Penal Code § 245(a)(1)), and being an active participant in a criminal street gang (Cal. Penal Code § 186.22(a)). The jury also found true a special allegations that Petitioner committed his crimes for the benefit of a criminal street gang (Cal. Penal Code § 186.22(b)(1)) and personally inflicted great bodily injury upon the victim. Petitioner was sentenced to a term of 18 years to life in prison.

On March 12, 2015, the California Court of Appeal vacated the assault by means likely to produce great bodily injury and the personal infliction of great bodily injury enhancement, and affirmed the conviction in all other aspects. On October 14, 2015, the California Supreme Court dismissed the case. Petitioner filed his petition with this Court on February 2, 2017. Respondent filed an answer on July 31, 2018.

## II.    Standard of Review

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000). On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed thereafter. *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997). Under the statutory terms, the petition in this case is governed by AEDPA's provisions because it was filed April 24, 1996.

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court. *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring). Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings. *Id.* Under AEDPA, a petitioner can obtain habeas corpus relief only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*, 529 U.S. at 413.

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71. In doing so, the Court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision. *Id.* The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* at 72. The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it. *Early v. Packer*, 537 U.S. 3, 8 (2002). The federal court must apply the presumption that state courts know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

"A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, the AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable. *Harrington*, 562 U.S. at 102.

### III. The State Court Did Not Err in Denying Petitioner's Insufficient Evidence Claim

Petitioner presents two insufficient evidence claims. First, Petitioner claims there was insufficient evidence that Petitioner was a member of a criminal street gang.[4] Second, Petitioner alleges there was insufficient evidence that he inflicted great bodily injury upon the victim.[5] The undersigned will address each argument in turn.

#### A. Standard of Review for Insufficient Evidence Claims

To determine whether the evidence supporting a conviction is so insufficient that it violates the constitutional guarantee of due process of law, a court evaluating a habeas petition must carefully review the record to determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Windham v. Merkle*, 163 F.3d 1092, 1101 (9th Cir. 1998). It must consider the evidence in the light most favorable to the prosecution, assuming that the trier of fact weighed the evidence, resolved conflicting evidence, and drew reasonable inferences from the facts in the manner that most supports the verdict. *Jackson*, 443 U.S. at 319; *Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997).

#### B. Insufficient Evidence – Criminal Street Gang

Petitioner claims the evidence presented by the gang experts was insufficient to show the DC or VCPN constituted a criminal street gang because there was no evidence to establish members of the gangs engaged in the requisite acts that define a criminal street gang. Instead, he claims the gang experts described predicate acts that were committed by member of different gangs – the Brown Pride Norteños and Sough Side Gang – and therefore the acts were insufficient to qualify as predicate crimes for Petitioner's gang. (Doc. 19 at 10-11, 24-25, 33-34.) Respondent counters

---

[4] In his petition, Petitioner labels this claim as grounds two, seven, ten, and thirteen. (See Doc. 19 at 7-8, 10-11, 24-25, 33-34, 42-43.)
[5] In his petition, Petitioner labels this claim as grounds one, four, and eight. (See Doc. 19 at 7-8, 15-16, 27-28.)

that the California Court of Appeal decided this question based on California law; therefore, this Court cannot reexamine the state court's determination. (Doc. 44 at 13.)

### 1. **State Court of Appeal Opinion**

The California Court of Appeal denied Petitioner's claim that there was insufficient evidence to enhance his sentence based on his participation in a street gang:

> [Petitioner] argues the evidence was insufficient to show the DC or VCPN constituted a criminal street gang because there was no evidence to establish members of the gang engaged in the requisite predicate acts. He claims the predicate acts were committed by members of different gangs – the Brown Pride Norteños and South Side Locs – and the acts were therefore insufficient to qualify as predicates for [Petitioner]'s gang. We find [Petitioner]'s argument unpersuasive.
>
> In evaluating a claim the evidence is insufficient to support the verdict, we review "'the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence – that is, evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" [ ] We review the evidence in favor of the judgment and will uphold the judgment as long as the circumstances reasonably justify the jury's findings. [ ] "Before a judgment of conviction can be set aside for insufficiency of the evidence to support the trier of fact's verdict, it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support it." [ ]
>
> Section 186.22, subdivision (a) criminalizes the active participation in a "criminal street gang" with knowledge that its members engage in "a pattern of criminal gang activity" and who willfully promotes, furthers or assists gang members in felonious criminal conduct. Likewise, section 186.22, subdivision (b)(1) provides for increased punishment for any person who is convicted of a felony that is "'committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.'" [ ]
>
> The term "criminal street gang" is defined in subdivision (e) of section 186.22:
>
> > "As used in this chapter, 'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the [33 enumerated crimes], provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons."

[Petitioner]'s argument on appeal is limited to the lack of evidence at trial demonstrating the predicate acts presented were committed by members of his gang. [Petitioner] does not contend the predicate acts proven at trial were insufficient to demonstrate a pattern of criminal gang activity as defined in section 186.22, subdivision (e), or that any other element required by section 186.22, subdivision (a) or (b) was lacking. Thus, we will confine our discussion to the issue raised by [Petitioner].

[Petitioner] relies heavily upon this court's prior opinion in *People v. Williams* (2008) 167 Cal.App.4th 983 (*Williams*) in making his argument. As we will explain, *Williams*, is distinguishable. There, the defendant was convicted of murder (§ 187, subd. (a)) and the substantive offense of active participation in a criminal street gang in violation of section 186.22, subdivision (a), and the court found true a gang-related special circumstance allegation (§ 190.2, subd. (a)(22)). On appeal, we addressed the issue of "the relationship that must exist before a smaller group can be considered a part of a larger group for purposes of determining whether the smaller group constitutes a criminal street gang." (*Williams*, *supra*, 167 Cal.App.4th at p. 985.) The prosecution presented evidence of a larger group known as the Peckerwoods, and a small group known as the Small Town Peckerwoods ("STP"). Specifically, an expert witness opined the Peckerwoods qualified as a criminal street gang and that smaller groups, such as the STP, "are all factions of the Peckerwood organization." (*Id*. at p. 988.) While the expert testified the Peckerwoods shared a White pride or White supremacist ideology, he explained the group was not "organized like other criminal street gangs . . . : for the most part, they have no constitution, and are a looser organization with a less well-defined rank structure." (*Ibid*.) Defendant argued that although there was evidence he was an active participant in the smaller group, "there was insufficient evidence of a connection between members of the Small Town Peckerwoods and [the larger group]." (*Id*. at p. 987.)

This court agreed with the defendant and held that in considering whether the criminal street gang element of the offense had been established, the trier of fact could not consider evidence relating to the larger Peckerwoods group because the People had not established a sufficient connection between the smaller group and the larger group.

> "[S]omething more than a shared ideology or philosophy, or a name that contains the same word, must be shown before multiple units can be treated as a whole when determining whether a group constitutes a criminal street gang. Instead, some sort of collaborative activities or collective organizational structure must be inferable form the evidence, so that the various groups reasonably can be viewed as parts of the same overall organization. . . . On the record before us, however, it would be speculative to infer that the Small Town Peckerwoods and greater Peckerwood gang shared more than an idealogy . . . ." (*Williams*, *supra*, 167 Cal.App.4th at pp. 988-989, fn. omitted.)

13

*Williams* is inapposite. [ ]  As indicated above, the issue there was whether it could be established that the *smaller group* was a criminal street gang based on the extent of its connection with the larger group.  (*Williams*, *supra*, 167 Cal.App.4th at p. 985 ["we . . . address the relationship that must exist before a small group can be considered a part of a larger group for purposes of determining whether the smaller group constitutes a criminal street gang"].)  That issue is not before us here; we need not decide whether the small group – the DC or VCPN – qualified as a criminal street gang in its own right because regardless of what the evidence established regarding the status of those groups, the evidence was sufficient to establish that the Norteños are a criminal street gang.

At trial, it was apparent the prosecution argued [Petitioner] was a member of the Norteño gang, as well as a member of the DC and VCPN, which are subsets of the greater Norteño gang.  Indeed, at trial, Martinez testified regarding the organization, colors, and symbols of the *Norteño* gang.  Specifically, the Norteño gang associates with the numbers 1 and 4, the letter "N," the color red, and a five-point star.  The primary rival of the Norteños is the Sureño gang.  The gang is primarily composed of Hispanics and generally occupies the northern part of the state.  He noted there were 126 documented *Norteño* gang members in the city of Parlier.  The Norteño gang is directly under the Nuestra Familia and follows its code of conduct.

The DC and VCPN are subsets and part of the Norteño gang.  Martinez described a subset as part of the gang that identified with a particular geographical area. [Petitioner] admitted membership in the Norteño gang, had prior law enforcement contacts, with other Norteño gang members, was observed wearing Norteño gang colors, and had tattoos related to the Norteño gang.  Additionally Martinez had reviewed a photograph of [Petitioner] together with other known gang members where he was making a hand signal of the letter "N," a sign of the Norteño gang.

Smyres opined the stabbing was done for the benefit of the Norteño gang, and the actions in this case were consistent with the Norteño structure.  During the assault, [Petitioner] was seen wearing a red T-shirt.  The victim was a Sureño gang member, a rival of the Norteños.  [Petitioner] admitted his membership in both the DC and the Norteño gangs and further admitted the men he was with that night were all members of the Norteño gang with the exception of Meduna.  In closing argument, the People argued [Petitioner] was a member of the Norteño gang, and as such the People were required to prove the Norteños constituted a criminal street gang.  From the foregoing evidence, it is clear the criminal street gang at issue is the Norteños, not the DC or VCPN as [Petitioner] asserts.

As we recognized in *Williams*, "[e]vidence of gang activity and culture need not necessarily be specific to a particular local street gang as opposed to the larger organization."  (*Williams*, *supra*, 167 Cal.App.4th at p. 987.)  And in *People v. Ortega* (2006) 145 Cal.App.4th 1344 the court concluded the People were not required to prove which subset of the Norteños committed the charged offenses:

"We reject defendant's assertion that the prosecution had to prove precisely which subset was involved in the present case.  No evidence indicated the

14

goals and activities of a particular subset were not shared by others. There was sufficient evidence that Norteño was a criminal street gang, that the murder was related to activity of the gang, and defendant actively participated in that gang. There is no further requirement that the prosecution prove which particular subset was involved here." (*People v. Ortega*, *supra*, 145 Cal.App.4th at pp. 1356-1357; see *In re Jose P.* (2003) 106 Cal.App.4th 458, 467-467.)

Thus, the question presented on appeal is whether the People proved members of the Norteño gang committed the required predicate offenses. On this issue, the People presented evidence that Paul Hernandez was convicted of first degree burglary in 2010. In addition, Salvador Zamora was convicted of a home invasion robbery in 2010 with Hernandez. Both Hernandez and Zamora had numerous law enforcement contacts that Smyres reviewed in forming his opinion. Based upon his review of the documentation, he opined both Hernandez and Zamora were members of the Brown Pride Norteños which is a subset of the greater Norteño gang. Furthermore, the evidence established Nicholas Mejia Sumaya was convicted of an assault with a deadly weapon upon a Sureño gang member in 2008. During the assault, Sumaya yelled, "'who are you scrap'" and "'Norte.'" Smyres reviewed Sumaya's 12 prior gang-related contacts with law enforcement and opined Sumaya was an active member of the South Side Locs, a subset of the Norteño gang in Hanford. Thus, the evidence established that members of the Norteño gang had engaged in a "pattern of criminal gang activity."

To the extent [Petitioner] argues there was insufficient evidence linking the Brown Pride Norteños and South Side Locs to the greater Norteño gang, we reject the claim. As indicated above, such a relationship is established if the two groups have "some sort of . . . collective organizational structure" from which the requisite "overall organization" is "inferable." (*Williams*, *supra*, 167 Cal.App.4th at pp. 988-989)[.] The testimony of Officer Martinez and Deputy Smyres established the subsets of the Norteños operated under a unified structure. The Norteño gang operated under a constitution containing the "14 bonds" that provides how those within the gang are to conduct themselves. Norteño subsets are identified with a particular geographical area. The Brown Pride Norteños are a subset of the Norteño street gang that identifies with the area of Lemoore and Stratford. Likewise, the South Side Locs is a subset of the Norteño gang located in Hanford.

The facts underlying Sumaya's conviction further demonstrate the subset was a part of the larger gang. Smryes testified Sumaya was convicted of assaulting a Sureño gang member, the primary rival to the Norteños, and during the attack he used the derogatory term "scrap." In addition, he used the term "Norte" which, as the testimony established, is short for Norteño. From the evidence as a whole, the jury could infer Hernandez, Zamora, and Sumaya were all active Norteño gang members. Thus, the evidence is sufficient to demonstrate the Norteños constitute a criminal street gang within the meaning of section 186.22. Therefore, we reject [Petitioner]'s claim.

*People v. Torres*, F067249 (Cal. Ct. App. Mar. 12, 2015), at 15-21.

## 2. **Denial of Petitioner's Insufficient Evidence of Gang Enhancement Claim Was Not Objectively Unreasonable**

Petitioner contends the evidence adduced at trial was insufficient to support the conviction and gang enhancement. The jury found true the allegation that Petitioner was an active participant in a criminal street gang (Cal. Penal Code § 186.22(a)(1)) and committed his crimes for the benefit of a criminal street gang (Cal. Penal Code § 186.22(b)(1)).

California Penal Code section 186.22(a) criminalizes active participation in "any criminal street gang with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang." Section 186.22(b)(1) increases the punishment for any person who is convicted of a felony that is "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."

California defines a criminal street gang as

> any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated [in section 186.22], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity.

Cal. Penal Code § 186.22(f).

A "pattern of criminal activity" is defined as

> the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [33 enumerated crimes], provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons.

Cal. Penal Code § 186.22(e).

Here, Petitioner contends the evidence adduced at trial was insufficient to support a finding that the DC or VCPN were involved in "a pattern of criminal activity," and therefore a criminal street gang.

This Court does not reweigh the evidence at trial, but must review the record to determine whether a rational trier of fact could have found the DC and VCPN were criminal street gangs. Evidence is considered in the light most favorable to the prosecution, and it is assumed that the jury weighed the evidence, resolved conflicting evidence, and drew reasonable inferences from the facts in a manner that supports the verdict. *Jackson*, 443 U.S. at 319. Accordingly, if the facts support conflicting inferences, the reviewing court "must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any conflicts in favor of the prosecution, and must defer to that resolution." *Id*. at 326.

Petitioner contends the prosecution was required to prove the DC and VCPN committed a "pattern of criminal activity." (Doc. 19 at 24-25.) Instead, Petitioner claims, one of the gang experts, Smyres, testified that two of Petitioner's accomplices in the crime were members of the Brown Pride Norteños and South Side Locs, both subsets of the Norteño gang, and there was no evidence to link Petitioner within either of these gang subsets. *Id*. at 10-11, 33-34.

However, both gang experts testified at trial that Petitioner was a member of both the Norteño gang, as well as its subsets the DC and VCPN. Smyres did testify that two of the individuals involved in the stabbing were members of the Brown Pride Norteños and South Side Locs. However, the experts also testified that the DC and VCPN are subsets of the Norteño gang, which identify with specific geographical areas. The evidence at trial also established that Norteños are a criminal street gang. Considering the evidence in the light most favorable to the prosecution, the evidence showed beyond a reasonable doubt that the Norteño gang, as well as the Norteño gang subsets, DC and VCPN, are a criminal street gang that engages in "pattern of criminal activity."

The Court of Appeal's decision was not an objectively unreasonable application of clearly established federal law nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. For these reasons, the Court recommends denying Petitioner's claim that there was insufficient evidence.

## C. **Insufficient Evidence – Great Bodily Injury**

Petitioner contends the evidence adduced at trial was insufficient to support the jury's finding that he caused great bodily injury, because there was no evidence that he stabbed the victim. (Doc. 19 at 15-16, 27-28.) Petitioner alleges there was no proof that he had a knife during the incident, or that he stabbed the victim, and it is "equally likely the actual stabber gave Petitioner the knife/or Lopez." *Id*. at 16. Respondent did not respond to Petitioner's claim that there was insufficient evidence to convict him of attempted murder.

### 1. **State Court of Appeal Opinion**

In his appeal to the California Court of Appeal, Petitioner argued there was insufficient evidence to support a finding that he personally inflicted great bodily injury upon the victim. *Torres*, F067249, at 2. The Court rejected this argument:

> [Petitioner] argues the evidence is insufficient to support the great bodily injury enhancement. The court instructed the jury with the group beating instruction. (CALCRIM No. 3160.)[6] [Petitioner] seems to contend the instruction was

---

[6] As read to the jury, CALCRIM No. 3160 states:

> If you find the defendant guilty of the crimes charged in Counts 1, 2, or 3, you must then decide whether, for each crime, the People have proved the additional allegation that the defendant personally inflicted great bodily injury on Jaime Ocegueda in the commission of that crime. . . .

> Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

> If you conclude that more than one person assaulted Jaime Ocegueda, and you cannot decide which person caused which injury, you may conclude that the defendant personally inflicted great bodily injury on Jamie Ocegueda if the People have proved that:

> 1. Two or more people, acting at the same time, assaulted Jaime Ocegueda and inflicted great bodily injury on him;

unsupported as it was not impossible to determine who inflicted the victim's injuries. We conclude the evidence was sufficient to support the instruction and the jury's findings.

When a defendant challenges the sufficiency of the "evidence to support the judgment, our review is circumscribed. [ ] We review the whole record most favorable to the judgment to determine whether there is substantial evidence – that is, evidence that is reasonable, credible, and of solid value – from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof." (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 298.) Further, we review

> "the evidence in the light most favorable to the prosecution, [asking whether] *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [ ] This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. (*Jackson v. Virginia* (1979) 443 U.S. 307, 913.)

"Before a judgment of conviction can be set aside for insufficiency of the evidence to support the trier of fact's verdict, it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support it." (*People v. Rehmeyer* (1993) 19 Cal.App.4th 1758, 1765.)

---

2. The defendant personally used physical force on Jaime Ocegueda during the group assault;

   AND

3. The amount or type of physical force the defendant used on Jaime Ocegueda was enough that it alone could have caused Jaime Ocegueda to suffer great bodily injury

   OR

[4.] The physical force that the defendant used on Jaime Ocegueda was sufficient in combination with the force used by the others to cause Jaime Ocegueda to suffer great bodily injury.

The defendant must have applied substantial force to Jaime Ocegueda. If that force could not have caused or contributed to the great bodily injury, then it was not substantial.

The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved.

(Lodged Doc. 1 at 305-6.)

"Whether the evidence presented at trial is direct or circumstantial, . . . the relevant inquiry on appeal remains whether *any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.  [ ]"  (*People v. Towler* (1982) 31 Cal.3d 105, 119.)

"'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [ ], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.  "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'"  [ ]'  [ ]  "'Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.'"  [ ]"  (*People v. Stanley* (1995) 10 Cal.4th 764, 795-793.)

"Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years."  ([Cal. Penal Code] § 12022.7, subd.(a).)  The phrase "personally inflicts" means that the defendant himself must have personally and directly inflicted the injury.  (*People v. Cole* (1982) 31 Cal.3d 568, 572, 579.)  Great bodily injury requires a significant or substantial physical injury; an insignificant or trivial injury does not suffice. ([Cal. Penal Code] § 12022.7, subd. (f); *People v. Martinez* (1985) 171 Cal.App.3d 727, 735; *People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1066.)

The evidence at trial established the victim suffered three separate stab wounds, requiring him to be airlifted to the hospital.  Thus, there is ample evidence the victim in fact suffered great bodily injury.  [Petitioner] does not dispute this finding; rather, he claims the evidence was insufficient to prove he personally inflicted the injury.  He bases his argument upon the premise the video surveillance established it was Talavera who caused the stab wounds, not [Petitioner].  He claims the video surveillance shows Talavera stabbing the victim and later leaving the area while folding a knife and putting it in his pocket.

We disagree with [Petitioner]'s interpretation of the evidence.  Due to the lighting, it is very difficult to view exactly what happened during the attack on the victim.  [Petitioner] can be seen exiting the casino, and movements indicating an attack can be seen from the different camera angles.  [Petitioner] correctly contends someone other than [Petitioner] can be seen in one video punching the victim while he is on the ground.  Based on this circumstance, he contends it is impossible to determine who inflicted the stab wounds.  We disagree.

The evidence is sufficient to establish [Petitioner] was involved in the fight.  Indeed, Lopez testified [Petitioner] punched the victim outside, but did not do so more than two times.  Additionally she testified [Petitioner] gave her a folding knife shortly after the attack as they were walking back to town, and she concealed it in her boot.

Officers later discovered the knife and seized it. Analysis of the knife revealed the victim's blood on the blade. The evidence established the victim suffered three separate stab wounds to his torso.

From the above evidence, the jury could conclude [Petitioner] stabbed the victim at least once when he was observed punching the victim, resulting in one of the three cuts to the victim's torso. Although [Petitioner] denied punching or stabbing the victim or possessing the knife at any point in time, the jury was free to disbelieve his testimony. The jury could have likewise concluded Talavera stabbed the victim one or more times. However, it was impossible to tell from the evidence who inflicted which stab wound and which stab wound, either alone or in combination, caused the great bodily injury.

Given the fact [Petitioner] was observed punching the victim and was in possession of a knife containing the victim's blood, the jury could certainly determine [Petitioner] personally inflicted one or more of the stab wounds to the victim.[fn.4] Because there was also evidence from which it could infer another member of the group also inflicted a stab wound, it could find it was impossible to determine who inflicted each wound. When it is unclear which of multiple assailants actually caused a great bodily injury, an enhancement may be imposed on each of the assailants who used force substantial enough, either alone or in combination, to have caused the injury. (*People v. Modiri* (2006) 39 Cal.4th 481, 486, 494, 496-497; accord, *People v. Dunkerson* (2007) 155 Cal.App.4th 1413, 1418; *People v. Corona* (1989) 213 Cal.App.3d 589, 594.)

> Fn.4    [Petitioner] argues in his reply brief that the People are "precluded on appeal from raising a different theory of criminal liability than the theory raised by the prosecution in the trial court." [Petitioner] relies upon *People v. Miller* (2007) 146 Cal.App.4th 545, 551 for this proposition. *Miller* is inapposite. *Miller* dealt with whether the appellate court should remand a case to the trial court after the denial of a motion to suppress where the only issue to be litigated on remand was one that was foreclosed by the facts as testified or conceded by the prosecution at the start of the hearing. Under such circumstances it would be "plainly unfair to allow [the People] to relitigate the issue." (*Ibid.*) Unlike *Miller*, the People are not seeking to present additional evidence on the matter. The question here is whether the jury was presented with evidence supporting the conclusion [Petitioner] was the actual stabber. When reviewing the sufficiency of the evidence, we review all the evidence in the light most favorable to the prosecution to determine whether there was evidence from which the jury could reach its verdict. (*In re Jerry M.*, *supra*, 59 Cal.App.4th at p. 298.) The jury was instructed it could find the great bodily injury enhancement true if it found [Petitioner] personally inflicted the injury. As the jury was presented with evidence and instructions supporting this theory at trial, we may review the evidence on appeal.

In *People v. Banuelos* (2003) 106 Cal.App.4th 1332, the court upheld the giving of a group beating instruction where the evidence established the defendant along with eight others attacked the victim, causing severe cuts to his head and a broken jaw. The evidence demonstrated the defendant struck the victim in the jaw with a bat, but there was additional evidence that further established other blunt instruments were used in the attack. There was also testimony that it was impossible to tell if the victim's broken jaw was caused by the bat or by one of the other blunt instruments. (*Id*. at pp. 1334-1335, 1338.) The court explained the jury could reasonably conclude it was impossible to trace the victim's injuries to any specific blow. (*Id*. at p. 1338.)

Likewise here, there was evidence [Petitioner] was observed punching the victim, and he was in possession of a knife stained with the victim's blood shortly after the assault. There was additional evidence through the video surveillance that someone other than [Petitioner] made stabbing motions toward the victim while he was on the ground. Given this evidence, and the fact the victim suffered a total of three stab wounds, the jury could reasonably determine it was impossible to conclude which wound was inflicted by which blow. By its terms, the challenged instruction applied only if the jury found more than one person assaulted the victim, but the jury could not determine which person caused which injury. We presume the jury understood and properly applied the instruction. (*People v. Homick* (2012) 55 Cal.4th 816, 861.)

*Torres*, F067249, at 11-15 (emphasis in original).

### 2. Denial of Petitioner's Insufficient Evidence of Great Bodily Injury Claim Was Not Objectively Unreasonable

Petitioner contends, based on the evidence presented at trial, the jury could not determine who stabbed the victim; therefore, there was insufficient evidence to find he caused the victim great bodily harm. (Doc. 19 at 15-16, 27-28.)

Evidence is considered in the light most favorable to the prosecution, and it is assumed that the jury weighed the evidence, resolved conflicting evidence, and drew reasonable inferences from the facts in a manner that supports the verdict. *Jackson*, 443 U.S. at 319. Accordingly, if the facts support conflicting inferences, the reviewing court "must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any conflicts in favor of the prosecution, and must defer to that resolution." *Id*. at 326.

Pursuant to the California Penal Code § 12022.7(f), "'great bodily injury' means a significant or substantial physical injury." The jury was instructed they could find Petitioner caused great bodily injury, if:

1. Two or more people, acting at the same time, assaulted Jaime Ocegueda and inflicted great bodily injury on him;

2. The defendant personally used physical force on Jaime Ocegueda during the group assault;

   AND

3. The amount or type of physical force the defendant used on Jaime Ocegueda was enough that it alone could have caused Jaime Ocegueda to suffer great bodily injury

   OR

[4.] The physical force that the defendant used on Jaime Ocegueda was sufficient in combination with the force used by the others to cause Jaime Ocegueda to suffer great bodily injury.

(Lodged Doc. 1 at 305-6.)

Here, there was video evidence that showed Petitioner involved in the fight with the victim and punching the victim. Further, Lopez, who was with Petitioner during and after the stabbing, testified that Petitioner gave her a knife that was later found to contain the victim's blood.

Although there was also evidence that other individuals hit the victim and could have stabbed him, when a defendant is "able to cross-examine the eyewitnesses and to argue to the trier of fact that the discrepancies in their identifications made those identifications unreliable," the "trier of fact then ha[s] the responsibility of determining whether the identifications were credible." *United States v. Ginn*, 87 F.3d 367, 369 (9th Cir. 1996) (citing *United States v. Alexander*, 48 F.3d 1477, 1490-91 (9th Cir. 1995)). A reviewing court "must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the

verdict." *Walters v. Maas*, 45 F.3d 1355, 1358 (9th Cir. 1995). The jury was presented with all of the evidence and assessed the credibility of Lopez and found her to be credible. "[T]he assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995).

Based on the evidence, the jury could conclude (1) Petitioner assaulted the victim; (2) Petitioner personally used force against the victim; and (3) Petitioner used enough force on the victim to cause him a great bodily injury; or (4) the force Petitioner used in combination with the other assailants caused the victim great bodily injury.

The Court of Appeal's decision was not an objectively unreasonable application of clearly established federal law nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. For these reasons, the undersigned recommends denying Petitioner's claim that there was insufficient evidence to support a finding that Petitioner inflicted great bodily injury upon the victim.

**IV.    Petitioner Did Not Exhaust His State Remedies on his Aiding and Abetting and Prosecutorial Misconduct Claims**

Petitioner alleges he was convicted of aiding and abetting on a "theory without proof that [Petitioner] knew in advance, and with sufficient time to withdraw from assisting the accomplice, what specific criminal action the accomplice intended to take."[7]  (Doc. 19 at 12-13.)  Further, Petitioner claims the prosecutor misstated material facts by "prejudicially misstat[ing] the elements of, and the evidence necessary to prove guilt of, assault by means."[8]  (Doc. 19 at 30-31.) Respondent contends Petitioner failed to exhaust the aiding and abetting claim in state court. (Doc. 44 at 13.)

---

[7] In his petition, Petitioner labels this claim as ground three.  (See Doc. 19 at 12.)
[8] In his petition, Petitioner labeled this claim as ground nine.  (See Doc. 19 at 30-31.)

24

A petitioner who is in state custody and wishes to collaterally challenge his conviction by a petition for writ of habeas corpus must exhaust state judicial remedies. 28 U.S.C. § 2254(b)(1). The exhaustion doctrine is based on comity to the state court and gives the state court the initial opportunity to correct the state's alleged constitutional deprivations. *Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Rose v. Lundy*, 455 U.S. 509, 518 (1982); *Buffalo v. Sunn*, 854 F.2d 1158, 1163 (9th Cir. 1988).

A petitioner can satisfy the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider each claim before presenting it to the federal court. *Duncan v. Henry*, 513 U.S. 364, 365 (1995); *Picard v. Connor*, 404 U.S. 270, 276 (1971); *Johnson v. Zenon*, 88 F.3d 828, 829 (9th Cir. 1996). A federal court will find that the highest state court was given a full and fair opportunity to hear a claim if the petitioner has presented the highest state court with the claim's factual and legal basis. *Duncan*, 513 U.S. at 365; *Kenney v. Tamayo-Reyes*, 504 U.S. 1, 8 (1992).

The petitioner must also have specifically informed the state court that he was raising a federal constitutional claim. *Duncan*, 513 U.S. at 365-66; *Lyons v. Crawford*, 232 F.3d 666, 669 (9th Cir. 2000), *amended*, 247 F.3d 904 (2001); *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999); *Keating v. Hood*, 133 F.3d 1240, 1241 (9th Cir. 1998). If any of grounds for collateral relief set forth in a petition for habeas corpus are unexhausted, the Court must dismiss the petition. 28 U.S.C. § 2254(b)(1); *Rose*, 455 U.S. at 521-22.

Petitioner contends he raised both of these claims in his petition for writ of habeas corpus before the California Supreme Court; however, the arguments do not appear in any of his petitions that were submitted in California state court. (See Lodged Docs. 15, 20.)

It is established that it is the petitioner's burden to prove that state judicial remedies were properly exhausted. 28 U.S.C. § 2254(b)(1)(A); *Darr v. Burford*, 339 U.S. 200, 218-19 (1950), *overruled in part on other grounds in Fay v. Noia*, 372 U.S. 391 (1963); *Cartwright v. Cupp*, 650 F.2d 1103, 1104 (9th Cir. 1981). If available state court remedies have not been exhausted as to all claims, a district court must dismiss a petition. *Rose v. Lundy*, 455 U.S. 509, 515-16 (1982). *See also Raspberry v. Garcia*, 448 F.3d 1150, 1154 (9th Cir. 2006); *Jiminez v. Rice* 276 F.3d 478, 481 (9th Cir. 2001) (both holding that when none of a petitioner's claims has been presented to the highest state court as required by the exhaustion doctrine, the Court must dismiss the petition).

Because Petitioner did not exhaust his aiding and abetting or prosecutorial misconduct claims before the state court, the undersigned recommends the claims be dismissed.

## V.  Petitioner's Improper Conviction Theory Claim Does Not Warrant Federal Habeas Relief

Petitioner contends he was improperly convicted of attempted murder, because the jury could have improperly relied on a "natural and probable consequences theory" that he aided and abetted the crime.[9]  (Doc. 19 at 18-22.)  In his petition for writ of habeas corpus before the Kings County Superior Court, Petitioner based this argument on the California Supreme Court's decision in *People v. Chiu*, 59 Cal.4th 155 (2014).

In *Chiu*, the California Supreme Court held that an aider and abettor may not be convicted of first degree premeditated murder under a natural and probable consequences doctrine. *Id.* at 158-59.  Instead, aiding and abetting liability must be based on direct aiding and abetting principles, specifically, "the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." *Id.*  Petitioner claims the jury could

---

[9] In his petition, Petitioner labels this claim as grounds five and six. (See Doc. 19 at 18-22.)

have incorrectly convicted him of the victim's murder under the natural and probable consequences

theory, which was invalidated by *Chiu*.

## A. <u>State Superior Court Opinion</u>

Petitioner presented this claim in his state petition for writ of habeas corpus before the Kern

County Superior Court. The trial court rejected his argument:

> Petitioner's actions went way beyond some minimal encouragement of the attack, and appear to have been done with a specific intent to kill the victim. Although Petitioner has denied punching or stabbing the victim, possessing the knife at any point in time, and/or intending to kill the victim, the jury was free to disbelieve his testimony.
>
> Furthermore, in *Chiu* the California Supreme Court held: "[An] aider and abettor may not be convicted of first degree premeditated murder under the natural and probable consequences doctrine. Rather, his or her liability for that crime must be based on direct aiding and abetting principles. [ ]" (*People v. Ch*[*iu*], *supra*, 59 Cal.4th at pp. 158-159.) Here, [Petitioner] was not convicted of aiding and abetting the attempted murder of the victim. Instead, he was found to have <u>directly participated in the attack</u>. [Fn.3] As a result, *Chiu* does not provide Petitioner with grounds for habeas corpus relief.
>
>> Fn.3  In its Opinion, the California Court of Appeal discussed Petitioner's personal involvement in the infliction of the victim's injury in connection with its review of the jury's finding that Petitioner personally inflicted great bodily injury upon the victim [Cal. Pen. Code §12022.7(a)].

(Lodged Doc. 23 at 3)(emphasis in original).

## B. <u>Habeas Relief Is Not Warranted on Petitioner's Instructional Error Claim</u>

"The Supreme Court has made clear that an instructional error permitting the jury to select

among alternative theories of guilty, one of which is invalid," does not require "an automatic

voiding of the verdict; instead, the claim must be assessed under the harmless error review

standard." *Lunsford v. Hornbeak*, 665 Fed. App'x 563, 564 (9th Cir. 2016) (citing *Hedgpeth v.

Pulido*, 555 U.S. 57, 58 (2008)); *see also Yates v. United States*, 354 U.S. 298, 312 (1957) (verdict

must be set aside in cases where the verdict is unconstitutional on one ground, but not on another,

and it is impossible to tell which ground the jury selected). Therefore, the question for this Court

is whether a reasonable argument can be made in support of the California court's determination that the *Chiu* error was harmless.

The Superior Court based its decision on eight facts that were set forth in the California Court of Appeal's decision:

1. The Casino surveillance video shows Petitioner[ ] and others following the victim towards the main entrance of the casino.

2. Surveillance video also shows the victim being attacked by the same group of males.

3. The males were members of the Norteno criminal street gang and/or subsets of the same. The victim was believed by the men to be a member of a rival gang; he had a tattoo of three dots on the web of his hand advertising his gang membership.

4. Petitioner was identified as one of the males seen in the video attacking the victim.

5. Petitioner was seen punching the victim.

6. Shortly before being stopped by police, Petitioner gave a knife to Sandra Lopez.

7. Testing of the knife revealed the presence of the victim's blood on the blade.

8. The victim was found to have suffered three separate stab wounds, requiring him to be airlifted to the hospital.

(Lodged Doc. 23 at 2-3.) The Superior Court held that based on this evidence, "the jury could conclude Petitioner stabbed the victim at least once when he was observed punching the victim resulting in one of the three cuts to the victim's torso." *Id*. at 3.

The Superior Court reasoned that based on the evidence presented at trial, the jury necessarily found Petitioner's liability based on direct aiding and abetting principles, rather than on a natural and probable consequences theory. Therefore, any error relating to the instruction on an incorrect aiding and abetting theory was harmless or not prejudicial. Although the jury was given the option to convict Petitioner of attempted murder on the grounds that he aided and abetted an act the natural and probable consequence of which was death, there is no reasonable possibility that

28

the jury relied on the theory when it convicted Petitioner of attempted murder. Accordingly, there is a reasonable argument to be made in support of the state court's denial of Petitioner's *Chiu* claim – the guilty verdict was based on a valid ground and any putative *Chiu* error was harmless.

For the foregoing reasons, the Court recommends denying Petitioner's claim that he was improperly convicted of attempted murder.

## VI. The State Court Did Not Err in Rejecting Petitioner's Ineffective Assistance of Counsel Claim.

Petitioner alleges counsel was ineffective for failing to seek a lay opinion and failing to reasonably investigate a video of the crime.[10] (Doc. 19 at 36-37, 39-40, 45-46.) The undersigned will address each claim in turn.

Petitioner raised these claims for the first time in a petition for writ of habeas corpus filed in the California Supreme Court. The Court summarily denied the petition. Because Petitioner raised these claims for the first time in his state habeas petition, which was denied without a written opinion, there is no reasoned state court opinion for the Court to review. Consequently, this Court must "perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable." *Haney v. Adams*, 641 F.3d 1168, 1171 (9th Cir. 2011) (internal citations omitted).

Petitioner must show that "there was no reasonable basis" for the California Supreme Court's ruling. *Id.* (quoting *Cullen v. Pinholster*, 563 U.S. 170, 188 (2011) (internal quotation marks omitted)). "A habeas court must determine what arguments or theories could have supported

---

[10] Petitioner labeled these claims as grounds eleven, twelve, and fourteen. (See Doc. 19 at 36-37, 39-40, 45-46.)

In ground eleven, Petitioner alleges, "[t]he State failed to disclose 'Brady' evidence that was in the possession of investigative agencies to which the State had access, as well as, Petitioner's counsel was ineffective in failing to conduct a reasonable pre-trial investigation." *Id.* at 36-37. However, in the supporting facts, Petitioner does not make a "Brady" violation claim, but instead states "[c]ounsel was ineffective in failing to investigate all of the footage prior to trial, discovering the dark video, and having it enhanced to show that Petitioner did not commit or aid and abet the knife assault." *Id.* at 36. Therefore, the undersigned considers this an ineffective assistance of counsel claim.

29

the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court." *Id*. (internal quotation marks omitted).

### A. <u>Standard of Review</u>

The purpose of the Sixth Amendment right to counsel is to ensure that the defendant receives a fair trial. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "[T]he right to counsel is the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that his trial counsel's performance "fell below an objective standard of reasonableness" at the time of trial and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. The *Strickland* test requires Petitioner to establish two elements: (1) his attorney's representation was deficient and (2) he suffered prejudice as a result of the deficient representation. Both elements are mixed questions of law and fact. *Id.* at 698.

These elements need not be considered in order. *Id.* at 697. "The object of an ineffectiveness claim is not to grade counsel's performance." *Id.* If a court can resolve an ineffectiveness claim by finding a lack of prejudice, it need not consider whether counsel's performance was deficient. *Id.*

### B. <u>Lay Opinion</u>

Petitioner contends trial counsel was ineffective in failing to "elicit Sandra Lopez's opinion that DeLeon was the stabber and her observations supporting that opinion." (Doc. 19 at 39.)

30

Lopez testified that DeLeon started the fight and punched the victim. (Lodged Doc. 23 at 205.) She also stated Petitioner was involved in the fight and punched the victim "not more than two" times. *Id*. at 210. After the fight, Petitioner gave her a knife while they were walking away from the casino. While at the police station, Lopez stated that she took the knife Petitioner gave her from her boot and put it in her pants "[b]ecause [Petitioner] had told me that the guy – the victim got stabbed." *Id*. at 203.

On cross-examination, the following exchange occurred:

| | |
|---|---|
| Defense Counsel: | You did not know that the victim had been stabbed until law enforcement informed you of that; is that correct? |
| Lopez: | Yes. |
| Defense Counsel: | And the person you [ ]now [k]now as [Petitioner], you didn't see him stab anybody? |
| Lopez: | No. |
| . . . | |
| Defense Counsel: | As far as the fight goes you saw [Petitioner] involved while the victim was standing – |
| Lopez: | Yes. |
| Defense Counsel: | – right?<br>And you saw him punch the victim? |
| Lopez: | Yes. |
| Defense Counsel: | Not more than two times? |
| Lopez: | Yes. |
| Defense Counsel: | Okay. And then you're testifying today that you left the Palace with [Petitioner] on foot, right? |
| Lopez: | Yes. |
| . . . | |
| Defense Counsel: | DeLeon didn't go with you guys? |

31

| | | |
|---|---|---|
| Lopez: | No. | |

. . .

Defense Counsel:   Do you remember ever stating to law enforcement that you didn't see the incident that you only saw it on the video?

Lopez:   Yes.

Defense Counsel:   Is that true?

Lopez:   Yes.

Defense Counsel:   So you really never saw the incident?

Lopez:   I did not see the victim getting stabbed but I did see the fight.

*Id.* at 228-231.

Petitioner's counsel asked Lopez several times whether she saw the victim get stabbed, to which she responded she did not see him stabbed. Lopez stated DeLeon started the fight and punched the victim, but during her testimony, Lopez never indicated DeLeon stabbed the victim.

Petitioner is alleging counsel's cross-examination of Lopez was inadequate. "[C]ounsel's tactical decisions at trial, such as refraining from cross-examining a particular witness or from asking a particular line of questions, are given great deference and must . . . meet only objectively reasonable standards." *Dow v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000) (citing *Strickland*, 466 U.S. at 688-89); *see also Gustave v. United States*, 627 F.2d 907, 905 (9th Cir. 1980) (an attorney's decision about how to impeach a witness "is obviously a matter of trial tactics").

It was not objectively unreasonable for the California Supreme Court to reject Petitioner's claim that counsel failed to adequately cross-examine Lopez. Counsel established several times that Lopez did not see the victim get stabbed; therefore, it would not have been useful for counsel to question Lopez regarding whether DeLeon stabbed the victim. For these reasons, the undersigned recommends denying Petitioner's ineffective assistance of counsel claim.

## C. Reasonable Investigation

Petitioner also alleges counsel was ineffective for failing to enhance one of the casino videos, which was dark. (Doc. 19 at 36-37.) Petitioner claims that if counsel had enhanced the video, it would have shown that he did not commit or aid and abet in the knife assault on the victim. *Id*. at 36. Petitioner states appellate counsel enhanced the video footage, and the video showed DeLeon stabbing the victim. *Id*. at 45. Petitioner claims in his petitions before this Court and the California Supreme Court that he attached exhibits that identify DeLeon as the person that stabbed the victim, but did not include these attachments with either petition.

Petitioner did not provide evidence showing that an enhanced video showed DeLeon stabbing the victim before this Court or the California Court of Appeal. There is no basis in the record to conclude that enhancing the video would have shown DeLeon, not Petitioner, stabbed the victim. Consequently, the Court recommends denying Petitioner's claim that counsel was ineffective for failing to enhance the video recording.

## VII. Cumulative Error

Finally, Petitioner alleges a "combined effect of individually harmless errors . . . rendered the defense far less persuasive than it otherwise would have been." (Doc. 19 at 48-49.)

Under the cumulative error doctrine, the combined effect of multiple errors at trial can give rise to a due process violation, if the errors rendered the trial fundamentally unfair, even if each error considered individually would not warrant relief. *See Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007). "[T]he fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense far less persuasive" and thus "had a substantial and injurious effect or influence on the jury's verdict." *Id*. (internal citation and quotation marks omitted). The Ninth Circuit has "granted habeas relief under the cumulative effects doctrine when there is a 'unique symmetry' of otherwise

harmless errors, such that they amplify each other in relation to a key contested issue in the case." *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011) (citing *Parle*, 505 F.3d at 927).

The Court has addressed each of the errors Petitioner has raised in his petition for writ of habeas corpus and found no error. Therefore, "[b]ecause we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible." *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011). Accordingly, the undersigned recommends denying Petitioner's claim of cumulative error.

## VIII. Certificate of Appealability

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, but may only appeal in certain circumstances. *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

> (c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

> (A)  the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

> (B)  the final order in a proceeding under section 2255.

> (2)  A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

> (3)  The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by

34

paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Accordingly, the Court recommends declining to issue a certificate of appealability.

## IX. <u>Recommendation and Conclusion</u>

Based on the foregoing, the undersigned recommends that the Court dismiss the petition for writ of habeas corpus with prejudice and decline to issue a certificate of appealability.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C □ 636(b)(1). Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court. The document should be captioned □Objections to Magistrate Judge's Findings and Recommendations. Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections. The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's order. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **March 4, 2019**                    /s/ *Sheila K. Oberto*
                                              UNITED STATES MAGISTRATE JUDGE